IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| ANNIE ROBINSON, et al. | * |
| | * |
| Plaintiffs, | * |
| v. | * Case No. PJM 09-181 |
| | * |
| PRINCE GEORGE'S COUNTY, MARYLAND et al., | * |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Come now the plaintiffs, by and through counsel, and hereby submit their opposition to the Motions for Summary Judgment filed by the defendants. It is defendants Lee and Kim's position that they are entitled to summary judgment because the plaintiffs have no admissible evidence that Cpl. Jenkins shot Travis Robinson; Cpl. Jenkins was not an agent or employee of theirs; they cannot be held liable under 42 U.S.C. § 1983; and there is no evidence that they negligently supervised Cpl. Jenkins. Defendants Kim and Lee further indicate that they are entitled to partial summary judgment on any claim that plaintiffs may have for economic losses other than funeral expenses and as to any claim for punitive damages for decedent's wrongful death.

Defendants Prince George's County and Cpl. Jenkins contend that they are entitled to summary judgment because Prince George's County has immunity for common law torts; a local government may not be liable for punitive damages; the bullet recovered from decedent was not fired from defendant Jenkins' service weapon; there is no evidence to show the causal connection between the injuries sustained by the decedent and defendant Jenkins' service weapon; there is no evidence of malice even if it can be shown that defendant Jenkins shot and killed the decedent; plaintiff cannot prove that Cpl. Jenkins violated the constitutional rights of Travis Robinson; and the plaintiffs cannot set forth any facts to support their claim of intentional infliction of emotional distress on the part of Cpl. Jenkins. Both of the defendants' motions are without merit with respect to the issues

actually before the Court and/or should be denied as moot in all other respects.

## Statement of Relevant Facts

At about 3:00 a.m. on January 28, 2007, the decedent, Travis Robinson, was in the parking lot of the Crystal Plaza Shopping Plaza on Route 197 in Laurel, Maryland, just having left J's Sports Café. This establishment in partly owned, in equal parts, by the defendants Kim and Lee, who were responsible for its day to day operations. While in the parking lot, a fight broke out with numerous people involved. Shortly thereafter, defendant Jenkins, who worked security for J's, approached the decedent and several other individuals and ordered everyone to clear the parking lot. As a result of this intervention, the crowd began to disperse.

As the crowd began to disperse, the decedent began to run towards his vehicle which was parked some distance away in the parking lot. As the decedent began to run towards his vehicle, defendant Jenkins fired a weapon one time striking the decedent in the lower abdomen thereby causing his death.

After Jenkins shot Travis Robinson, one of the people in the parking lot who had been with Mr. Robinson, Charles Hall, approached defendant Jenkins and asked why he had shot Mr. Robinson inasmuch as he had done nothing to warrant the use of deadly force. At the time defendant Jenkins shot Travis Robinson, there was no threat of death or serious bodily harm which he legitimately faced nor was there any such threat to any third party of which he was aware. At all times relevant to this action, defendant Jenkins was acting under color of law and as an agent of defendants Kim, Lee and Prince George's County.

## Argument

### 1. Standard of Review

"In determining whether summary judgment is appropriate, [the court] must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Odom v. South Carolina Dept. Of*

*Corrections*, 349 F.3d 765, 769 (4th Cir. 2003).

The Fourth Circuit in *Ross v. Communication Satellite Corp.*, 759 F.2d 355 (4th Cir. 1985), went on to further state:

> Care is required in deciding whether the evidence presents a genuine issue of motive, for "summary judgment is seldom appropriate in cases wherein particular states of mind are decisive as elements of [a] claim or defense." *Charbonnages de France v. Smith*, 597 F.2d at 414.  Resolution of questions of intent often depends upon "the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination." *Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141 (4th Cir. 1979).

*Id.* at 364-65.

### 2. The Kim and Lee Motion

#### a. Contrary To The Position Of The Defendants, There Is Admissible And Affirmative Evidence That Defendant Jenkins Shot and Killed Travis Robinson

**Affidavit of Charles Hall**

Mr. Hall indicates in an affidavit that he was at J's Sports Cafe with Travis Robinson when a fight broke out.  He further indicates that when a Prince George's County Police vehicle pulled up on the scene he and Travis Robinson began to run toward his vehicle.  Mr. Hall states that at this point he personally observed the police officer who got out of the car draw his weapon and shoot Travis Robinson.  Mr. Hall further states that he approached the officer who had shot his friend, and asked him why he had done that, he indicates that the officer told him to get the f— away, and then grabbed his shirt and pushed him away.  Exhibit 1.

**From the Deposition of Cpl. Jenkins**

Q  So within an hour there had been an allegation that you had fired your weapon?

A  From what I'm told, something like that.

Q  Well, when you were there, did anybody make that allegation?

A  Yes, he did.

Q  Who was the "he"?

A   Some guy. I don't know who it was.

Q   Did you hear it?

A   Did I hear what?

Q   Him allege that you had fired your weapon?

A   Yes. He approached me and said that I shot whatever this young man was.

Q   He approached you?

A   That is correct.

Q   Okay. So tell me how that happened.

A   As I was securing the crime scene, some young man approached me. He did make the allegation I fired my weapon. Of course, I told him to just get away from me because at that time I had two things on my mind: One was life of the young man that had been shot and also preserving my crime scene. So unless he had seen something in respect to a suspect shooting a weapon, "go to the side, I'll speak to you later." But that's the only allegations.

Q   Okay. So did you speak to him later?

A   No, I did not.

Q   I thought I understood you to say that you told him basically "get away from me"?

A   At that time. There were plenty other officers there he could have spoke to. Go ahead. I'm sorry.

Q   Did you identify him to anyone as a person who had made an allegation that you had fired your weapon?

A   That I had fired my weapon?

Q   I thought that's what you said he said.

A   Yes.

Q   What I am asking you is: Did you identify him to any of the other officers as someone who had indicated that you had fired your weapon?

A   No, I did not, because I know I didn't fire my weapon.

Q   Okay. So then who else did he make this allegation to?

A   He could have made the allegation to some other officers on the scene.

Q   What I am asking you is:  You said that they checked your weapon because an allegation had been made?

A   Let me backtrack.  Apparently he said it to someone -- because my weapon was checked -- to another officer that was on scene.

Q   You don't know who?

A   No, I do not.

Q   Who came to check your weapon, evidence technician you say?

A   Prince George's County evidence technicians.

Q   What did that person say to you about your weapon?

A   He was checking to see if it had been fired.

Q   He asked you for your weapon?

A   That is correct.

Q   You turned it over to him?

A   That is correct.

    *   *   *   *   *

Q   Okay.  Now, how many magazines do you normally carry?

A   I carry three magazines.

Q   And you keep one in your weapon, correct?

A   That is correct.

Q   And you keep two in your utility belt?

A   That is correct.

Q   And did he take the magazines from the utility belt?

A   Yes, sir.

Q   And your weapon, how many rounds does that carry?

A   Fifteen in the magazine, one in the chamber.

Q   So a max of 16 rounds?

>   A   That is correct.
>
>   Q   Do you keep one in the chamber?
>
>   A   That is correct.
>
>   Q   So when he checked your weapon, how many rounds did it have?
>
>   A   At that time, I think I might have been short one round.
>
>   Q   So at that time you had, what, 15?  I'm sorry -- yeah, 15 altogether?
>
>   A   Probably.  I know I was short a round.

Jenkins dep. at 15-21.  (Exhibit 2).

While Charles Hall was unable to obtain the name and badge number of the officer that he saw shoot Travis Robinson, it is clear, based upon the testimony of Cpl. Jenkins, that the officer that he encountered, confronted, and accused of shooting Travis Robinson was in fact Cpl. Jenkins. Thus, there is clear and admissible evidence from which a fact finder could find Cpl. Jenkins was the person who did in fact shoot Travis Robinson thereby causing his death.

      **b.**    **Defendants Lee And Kim Were Sued In Their Capacity As Representatives Of J's Sports Café**

In their complaint, the plaintiffs sued Alex Kim d/b/a J's Sports Café and Deok J. Lee d/b/a/ J's Sports Café.  Thus, they were sued in their representative capacity as principals of J's Sports Café.  Defendants Lee and Kim claim that they are entitled to summary judgment because Cpl. Jenkins was not their agent or employee.  However, the security agreement relating to the purchase of the assets of J's Sports Café from Crystal Plaza Restaurant, Inc., indicates that Mr. Kim and Mr. Lee "jointly and severally have executed a Confessed Judgment Deferred Purchase Money Promissory Note" pertaining the purchase of all of the assets of J's Sports Café.  Exhibit 3.

Moreover, defendant Kim filed a motion for summary judgment in this case (Document 17-2; 8/9/09) in which he states the following:

>   2. Defendant Kim and his wife filed for relief under Chapter 7 of the United States Bankruptcy Code on May 23, 2008, in the United States Bankruptcy Court for the Eastern District of Virginia, Bankruptcy Petition No. 08-12916-SSM.  A copy of

> Defendant Kim's Voluntary Petition under Chapter 7 is attached as Exhibit A. [1] Defendant Kim was discharged in that proceeding on September 8, 2008, as per the docket for that proceeding, a copy of which is attached as Exhibit B.
>
> 3. Although Plaintiffs had not filed suit at the time Defendant Kim filed his Voluntary Petition, they could have done so because all of the elements of the causes of action on which Plaintiffs seek to impose liability against Defendant Kim had occurred. Indeed, those causes of action had accrued on January 28, 2007, as soon as Travis Robinson died. Accordingly, as of that date, Plaintiffs had a "claim" against Defendant Kim, as defined in §101(4)(A) of the Bankruptcy Code, 11 U.S.C.A. §101(5). Had Plaintiff's suit been pending as of May 23, 2008, when Defendant Kim's Voluntary Petition was filed, it would have been automatically stayed as to him, as per 11 U.S.C.A. §362(a)(1), and that "claim," whether or not the subject of judicial action at the time, was discharged on September 8, 2008, as per 11 U.S.C.A. §727(b). *See Grady v. A.H. Robins Company, Inc.* 839 F.2d 198 (4th Cir. 1988). Accordingly, Plaintiffs cannot now proceed against Defendant Kim for any claims arising out of Travis Robinson's shooting because Defendant Kim has been discharged from any such liability.

Document 17-2 at 2-3.

Clearly, defendant Kim cannot have it both ways. On the one hand he claims that he is not a proper party, and on the other hand, he erroneously claims that his potential liability has been discharged in he and his wife's bankruptcy. Only a potential debt for which he is personally liable could possibly be discharged. Thus, by his own admission, plaintiffs' lawsuit properly seeks to hold him personally liable for the claims asserted herein.

In addition, defendant Kim stated the following in his response to plaintiffs' Interrogatory No. 3:

> Interrogatory No. 3: Please state your relationship with, and any and all actions taken on behalf of or in relationship to, J's Sports Café and/or entity located at 12617 Laurel Bowie Road, Laurel, Maryland.
>
> Answer to No.3: J's Sports Café was owned and operated, at the time of this incident, by D&A Restaurant, LLC, a Maryland limited liability company. This Defendant was a member of D&A Restaurant, LLC. This Defendant was involved in the day to day management of J's Sports Café after D&A Restaurant, LLC, took over its operations in late October 2006. This Defendant objects to that portion of this

---

[1]/ Although Defendant Kim has been identified by Plaintiffs in this case as "Alex Kim," his legal name is Young B. Kim, and that is the name under which his Voluntary Petition was filed.

> Interrogatory that asks him to recite "any and all actions taken by him" in connection with J's Sports Cafe's operation. **Given this Defendant's day-to-day management of J's Sports Café over a period of several months, asking him to recite everything he did, even were he able to do so, is impermissibly burdensome.** [Emphasis added.]

Exhibit 4. Under Maryland law,

> Officers of a corporation may be individually liable for wrongdoing that is based on their decisions and, where a corporate officer is present on a daily basis during commission of the total and five direct orders that cause commission of the tort, the officer may be personally liable. If an officer either specifically directed, or actively participated in the corporation's tort, personal liability may be imposed . . Thus, officers and agents of a corporation or limited liability company may be held personally liable . . . when they direct, participate in, or cooperate in the prohibited conduct. [citation omitted.]

*Mary CLE, LLC v. First Choice Internet, Inc.,* 166 Md. App. 481, 528, 890 A.2d 818, 845-46 (Md. App. 2006).

Moreover, Cpl. Jenkins verified that he was paid in cash by the management of J's Café, through Corporal Quick.

> Q    And as I understand it, you were paid in cash?
>
> A    That is correct.
>
> Q    Now, the money was paid to Corporal Quick. And he would pay it to you, or were you paid directly by the management of J's?
>
> A    Corporal Quick would receive the funds from management, who would, in turn, distribute to the officers who were working that night.

Jenkins dep. at 11-12. (Exhibit 2).

And while defendants Kim and Lee seek to hide behind the shield of a company, the fact of the matter is that the company shield they seek to hide behind no longer exists, Exhibit 5, and even when it did, these defendants were the only two (2) people that acted on behalf of the company, Exhibit 6, and sometimes they acted as a company and sometimes they did not. Exhibits 7, 8, and 9.

In sum, defendants Kim and Lee were J's Sports Café during the relevant period and there

are no undisputed facts suggesting otherwise.

### c. Plaintiffs Make No Claim Against Defendants Lee and Kim Pursuant to 42 U.S.C. § 1983

The defendants apparently misconstrue plaintiffs' complaint to allege a claim against defendants Kim and Lee for §1983 liability. Plaintiffs make no such claim, as their §1983 claim is based upon the conduct of Cpl. Jenkins and is therefore directed to him and only him. Thus, their motion in this regard must be denied as moot.

### d. Negligent Supervision As To Defendants Kim and Lee

The plaintiffs are not pursing a claim for negligent supervision against defendants Kim and Lee.

### e. Economic Losses

Plaintiffs make no claim for economic damages other than funeral expenses. Thus, defendants Kim's and Lee's motion for summary judgment as to economic losses other than funeral expenses is moot.

### f. Plaintiffs Are Not Seeking Punitive Damages Under the Wrongful Death Act

The plaintiffs are not seeking punitive damages under Maryland's Wrongful Death Statute, which is for the losses suffered by the decedent's beneficiaries as no such damages are recoverable under Maryland law. Accordingly, defendants Kim and Lee's motion for summary judgment as to plaintiffs' non-existing claim for punitive damages must be denied as moot.

### 3. The Prince George's County - Corporal Jenkins Motion

#### a. Plaintiffs Do Not Seek To Advance Any Common Law Claims Against Prince George's County, MD

Defendant Prince George's County claims that it is immune from suit for common law torts such as battery and intentional infliction of emotional distress. The plaintiffs do not quarrel with the County's position and therefore do not seek to advance any common law claims against Prince George's County directly. As such, the motion of Prince George's County is moot in this regard.

### b. Plaintiffs Do Not Seek Punitive Damages Against Prince George's County

Defendant Prince George's County asserts that the plaintiffs are seeking punitive damages against it. This contention is simply not true. Punitive damages are sought in plaintiffs' Survival Act claim against Cpl. Jenkins, and against the other defendants in this matter.

### c. There Is No Evidence Of Any Kind In Support Of The Contention That The Bullet Recovered From The Body Of Travis Robinson Was Not Fired By Cpl. Jenkins

Defendant Prince George's County asserts "Plaintiffs' claims against the defendants are premised on the contention that defendant Jenkins filed a single shot from his service weapon that caused the injury that took Travis Robinson's life." Mot. Mem. at 7. While this may be the position that defendants Prince George's County and Cpl. Jenkins would like for the plaintiffs to advance, that is simply not the position being advanced by the plaintiffs. The plaintiffs' position regarding the shooting of Travis Robinson is as follows:

Travis Robinson was in the parking lot of J's Sports Café when a fight brought out. A Prince George's County Police vehicle pulled up on the scene and Travis Robinson began to run toward his vehicle. Charles Hall, who was with Travis Robinson, then personally observed the police officer who got out of the car draw his weapon and shoot Travis Robinson. Mr. Hall then approached the officer who had shot his friend, and asked him why he had done that. The officer told him to get the f— away, and then grabbed his shirt and pulled him away. Exhibit 1.

In his deposition, Cpl. Jenkins acknowledges that Mr. Hall confronted him about firing his weapon and about shooting his friend. Cpl. Jenkins further acknowledged that his weapon was missing one (1) round of ammunition. Jenkins dep. at 15-21.

Defendants Prince George's County and Cpl. Jenkins further contend that "plaintiffs must be able to present evidence that show the causal connection between the bullet recovered from the decedent and the type of bullets found in defendant Jenkins' service weapon." Motion Mem. At 7. It is not explained under what theory of law do the plaintiffs have this burden. Defendant Prince

George's County and Cpl. Jenkins also contend, without any support at all, that "Defendant Jenkins' weapon fires a 9mm Parabellum, plus P plus, hydra-shok ammunition." Id.

However, there is no evidence of any kind that provides a basis for the proposition that Cpl. Jenkins' weapon only fires one type of ammunition. Anyone who knows anything about firearms knows that a 9 mm pistol can fire 38 caliber cartridges and other types of 9 mm cartridges. Moreover, Cpl. Jenkins does not suggest that his weapon only fires Parabellum, plus P plus hydra-shok ammunition in his deposition, he only indicated that the described ammunition was what he carried. Jenkins dep. at 24. These defendants further posit that "there is no evidence to show that a bullet in the caliber 38 class could be fired from Defendants' weapon.: *Id.* More importantly, though, is the fact that there is no evidence to show that a bullet in the caliber 38 class could not be fired from defendant Jenkins' weapon and there is direct evidence that Cpl. Jenkins was observed shooting plaintiffs' decedent. Exhibit 1.

The entire premise of the defense of Prince George's County and Cpl. Jenkins is based on the assumption that Cpl. Jenkins only had one weapon at the time that Travis Robinson was shot to death, and on the even more baseless contention that Cpl. Jenkins' weapon could only fire 9 mm Parabellum, plus P plus, hydra-shok ammunition. However, they have neither identified an expert who will support their incoherent position nor pointed to the testimony of any expert who has supported this position on the record. Defendant Jenkins was seen shooting Travis Robinson, Exhibit 1, something other than his lawyer's contention that the bullet recovered from Mr. Robinson could not have been fired from the weapon of defendant Jenkins is necessary to overcome this fact, which supports plaintiffs' position that Travis Robinson was shot to death by Cpl. Jenkins.

    b. **Plaintiffs' Battery Claim**

Charles Hall indicates that he observed Cpl. Jenkins exit a vehicle, draw a weapon and shoot Travis Robinson. He then indicated that he approached Cpl. Jenkins and asked him why he had shot his friend for no reason at all. Cpl. Jenkins responded by telling him to get the f–k away and by

telling Travis Robinson to stay down and refused to provide his name and/or his badge number. Exhibit 1.[2]

Incredulously, defendants Prince George's County and Cpl. Jenkins contend that even if this occurred, no reasonable juror could find that a battery was committed. Their position makes no legal sense. The Maryland Court of Appeals opined on the subject of malice as follows:

> We have consistently defined malice as "conduct 'characterized by evil or wrongful motive, intent to injure, knowing and deliberate wrongdoing, ill-will or fraud. [citation omitted.]

*Barbre v. Pope*, 402 Md. 157, 182, 935 A.2d 699, 714 9Md. 2007). In *Okiwa v. Harper*, 360 Md. 161, 182, 757 A.2d 118, 129 (Md. 2000), the Court of Appeals held that a jury could reasonably find malice from the actions of police officer who allegedly dragged Okiwa from the British Airways ticket counter at BWI Airport to the exit of the terminal, forcibly threw him to the ground and struck him in the back of the head and neck. It simply makes no legal sense that malice cannot be inferred from a police officer shooting an unarmed Travis Robinson without anything resembling just cause.

### d.    Plaintiffs' Claim For Intentional Infliction of Emotional Distress

An unarmed man was shot, he was holding his stomach and stumbling. He eventually fell to the ground after stating that he had been shot. Once on the ground, he lay there conscious, with his eyes open, breathing and unable to respond to requests for information. Jenkins dep. at 33-36. Exhibit 2. Prince George's County and Cpl. Jenkins submit that a reasonable juror could not conclude from these facts that Travis Robinson suffered severe emotional distress as he lay bleeding and dying in the parking lot of J's Café. This position is absolutely ridiculous. A man is shot for

---

[2]/ The Affidavit of Charles Hall clearly establishes a constitutional violation on the part of Cpl. Jenkins. Thus, to the extent that defendants Prince George's County and Cpl. Jenkins contend that the plaintiffs are precluded from advancing their § 1983 and Maryland Constitutional claims because no such showing had been made, they are obviously in error. Shooting an unarmed man in the stomach for no apparent reason constitutes an unlawful seizure. It is well established that the use of deadly force is unconstitutional if not used in response to a threat of serious bodily harm. Here, no threat has been alleged and, in fact, the defendant officer confirmed that he never felt threatened by Travis Robinson. Jenkins dep. at 34. (Exhibit 2).

-12-

no reason in his abdomen by a police officer. It is reasonable to infer that he knows that he has been seriously injured and that is why he is holding his stomach. It is also reasonable to infer that he knows that he needs help and that is why he states that he had been shot. And while we are unable to determine what level of emotional distress the dead experience immediately before they expire from wounds inflicted by another, it is reasonable to infer that the fear of dying causes severe emotional distress based upon everyday experiences, such as car accidents, airplane turbulence, terminal illness, and near drownings.

After he was shot, Travis Robinson was conscious and knew of his predicament. It is reasonable to infer, under such circumstances that he suffered severe emotional distress that was caused by Cpl. Jenkins shooting him for no reason. Cpl. Jenkins' actions are not arguably anything but outrageous and intolerable in a civilized society and, as such, no basis at all exists for summary judgment on plaintiffs' claim for intentional infliction of emotional distress.

Wherefore, for the reasons set forth herein and in the record of this proceeding, defendants' motions for summary judgment must be denied as set forth herein.

Respectfully submitted,

    /s/ Gregory L. Lattimer
Gregory L. Lattimer [15462]
1200 G Street, N.W.
Suite 800
Washington, DC 20005
Tel: (202) 638-0095